UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DELFINA S. SAUCEDO                                      No. 6:12-cv-02289-AC

                    Plaintiff,                          FINDINGS AND
                                                       RECOMMENDATIONS

      v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION

                    Defendants.

Judge ACOSTA, Magistrate Judge:

*Introduction*

Claimant Delfina Saucedo ("Claimant") seeks judicial review of a final decision by the

Commissioner of Social Security ("Commissioner") denying her application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381-1383(f).

This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Following a careful review of the record, the court concludes that this case should be reversed and

remanded for an award of benefits.

## Procedural History

Claimant filed an application for SSI benefits on November 4, 2008 alleging disability beginning November 19, 2007.  The Commissioner denied Claimant's claim initially and upon reconsideration. Claimant requested a hearing, and appeared before Administrative Law Judge John J. Madden, Jr. ("the ALJ") on January 8, 2007.  (Tr. at 116.)  The ALJ heard testimony, but scheduled a second hearing at a later date to hear additional evidence. (Tr. at 158.)  The parties reconvened for the second hearing on January 20, 2011. (Tr. at 97.) Shortly after it began, the ALJ adjourned the second hearing because the record was not fully developed and Claimant had additional doctor appointments scheduled after the hearing. (Tr. at 112-115.) The ALJ held a third hearing in August 2011, and thereafter issued a decision denying Claimant's application for benefits. (Tr. at 14-28, 50.) The Appeals Council denied her request for review, making the ALJ's opinion the Commissioner's final decision.  Claimant filed for review of the decision in this court on December 18, 2012.

## Factual Background

Claimant was born in 1962 and was forty-five years old at the onset of her alleged disability. Claimant attended high school through tenth grade, but dropped out prior to earning her diploma. (Tr. at 57, 71.)  She attempted to get her GED, but did not complete her classes because she "couldn't comprehend" them. (Tr. at 71.) Before she began experiencing her health problems, Claimant worked as a janitor, fast food worker, and short order cook. (Tr. at 26.)  Since 2008, Claimant has worked part-time doing odd jobs, cooking, and cleaning for her elderly neighbors. (Tr. at 57-58.) However, Claimant's part-time work did not rise to the level of substantial gainful

activity.  (Tr. at 16.)

Claimant lives alone in an apartment in Salem, Oregon, and has little regular income.  (Tr. at 127.)  She receives food stamps and collects bottles and cans for the deposit money.  (Tr. at 65-66.)  Her three daughters often buy her groceries and help her with household chores.  (Tr. at 65-66.)  Claimant does not have a driver's license and uses public transportation as her primary means of getting around, but occasionally receives rides from her daughter.  (Tr. at 65.)  At least once per week, Claimant goes to church.  (Tr. at 68.)  On occasion, Claimant's church group has helped pay her utility bills.  (Tr. at 299.)

I.  Medical Evidence

Claimant has a long history of physical and psychological problems, and she sought the aid of many doctors to address her ailments.  In March 2007 doctors at the Salem Primary Healthcare Clinic saw Claimant, who was complaining of lower back and wrist pain.  (Tr. at 899.)  Doctors took x-rays of her back, which indicated moderate to mild spondylosis in her lower back.  (Tr. at 899.)  Doctors also administered a nerve conduction study on Claimant's wrists, which showed mild to moderate neuropathy in both wrists.  (Tr. at 912)

In January 2009 Claimant sought treatment by licensed psychologist Dr. Patrice Carrello ("Dr. Carrello").  (Tr. at 1086.)  Claimant reported she was depressed, experienced panic attacks on a  daily basis, and was overwhelmed by financial needs.  (Tr. at 1086-87.)  Claimant explained she has never been hospitalized for a psychiatric problem, but has been on a variety of antidepressants since 1986 when she first experienced symptoms of depression.  "While this medication was initially effective, she believe[d] that it had lost its efficacy" during the three years prior to seeking Dr. Carrello's treatment.  (Tr. at 1087.)  Claimant also discussed her history of alcohol and drugs, and

explained that "she was exposed to all legal and illicit drugs before the age of 13" and abused heroin and alcohol as an adult, but claimed to be abstinent from drugs and alcohol since February 2006. (Tr. at 1088.) Dr. Carrello observed that, although Claimant's affect was "somewhat flat," she was appropriately dressed, cooperative with the interview, and was capable of organizing her thoughts into "a coherent portrait of herself." (Tr. at 1089.) Because Claimant had difficulty repeating a series of serial numbers forward and backwards, Dr. Carrello concluded Claimant had difficulty manipulating verbal information and had impaired "concentration attention." (Tr. at 1090.) Dr. Carrello assigned a Global Assessment of Functioning score ("GAF") of 60 and diagnosed Claimant with major depressive disorder and opioid dependence in sustained remission. (Tr. at 1090.) Ultimately, Dr. Carrello concluded Claimant would have difficulty performing detailed and complex tasks in the workplace, and "will have difficulty maintaining regular attendance . . . because of her psychiatric conditions." (Tr. at 1091.) Further, she concluded Claimant's psychiatric symptoms "will interfere with her ability to deal with demands of a competitive work environment." (Tr. at 1091.)

Dr. Richard Alley ("Dr. Alley"), the State agency non-examining medical consultant, reviewed Claimant's medical files and completed a physical residual functional capacity assessment in January 2009. (Tr. at 1092.) Dr. Alley determined Claimant was capable of light work, could occasionally lift and carry twenty pounds and frequently lift ten pounds; could sit, stand, or walk for six hours of an eight-hour work day; and had no limitations on pushing or pulling. He also determined Claimant could occasionally stoop, crouch, and crawl, but could never climb ladders, ropes or scaffolds. (Tr. at 1094.) Because of Claimant suffered from carpal tunnel syndrome, Dr. Alley determined Claimant should limit her gross handling, gripping, and twisting to frequent, and

avoid concentrated exposure to vibration. (Tr. at 1096.) He suggested a "light RFC with postural, manipulative, and environmental limitations." (Tr. at 1099.)

Claimant experienced increased neck and back pain through the beginning of 2009. In February 2009 she went to the emergency room complaining of lower back pain. An x-ray revealed "[s]evere degenerative disc disease" in two areas of her vertebral column. (Tr. at 1109.) Doctors also administered an MRI, which showed "disc herniation at multiple levels." (Tr. at 1109.) However, treating physicians observed Claimant "seem[ed] to be moving easily when asked to move for exam and was able to sit up from lying down to sitting up without any apparent back pain." (Tr. at 1140.)

Claimant was examined by Dr. Amy Cowan MD ("Dr. Cowan") in March 2009 at the request of the Commissioner. (Tr. at 1108-09.) Dr. Cowan observed Claimant was "somewhat disheveled," wore dirty clothing, and had dirty, unkempt hair. (Tr. at 1110.) Claimant was able to sit comfortably, walk to the examination room, and take her shoes off without difficulty. (Tr. at 1110.) Dr. Cowan noted Claimant used a cane, which she concluded was "not medically necessary and . . . was not prescribed." (Tr. at 1111.) Dr. Cowan diagnosed Claimant with (1) bilateral carpal tunnel syndrome; (2) chronic obstructive pulmonary disease; and (3) "lumbar back pain, most likely myofascial strain." (Tr. at 1112.) Dr. Cowan completed a physical residual functional capacity report ("RFC report") describing her conclusions, some of which conflict with her conclusions as stated in her medical report. (Tr. at 1107.) In the RFC report, Dr. Cowan opined that Claimant could occasionally lift twenty pounds; frequently lift ten pounds; stand and walk for six hours per eight hour work day; sit for six hours of an eight hour work day; frequently stoop, crouch, and crawl; occasionally handle, finger, and feel; but should avoid more than occasional exposure to extreme

temperatures and fumes, dusts, odors, and poor ventilation on account of Claimant's carpal tunnel syndrom and respiratory problems. (Tr. at 1107.)

In April 2009 Claimant saw Michael Scholar ("Scholar"), psychiatric mental health nurse practitioner ("PMHNP") for her stress and anxiety. She reported difficiulty sleeping, suicidal ideation, and panic attacks. (Tr. at 1193.) Claimant also explained she had been experienceing auditory hallucinations that are command and persecutory in nature. (Tr. at 1193-94.) The voices would tell her to "end it" and hurt others, but Claimant had "good insight" that the voices were coming from her own brain. (Tr. at 1194.) Scholar observed Claimant's mood was depressed and her affect was blunted, but noted her thought processes were "linear, goal directed, coherent, and cohesive." (Tr. at 1195.) He also noted Claimant was calm, interactive, and made good eye contact, but was a bit unkept and wore "slightly eccentric dress." (Tr. at 1195.) Scholar assessed a GAF of 48 and diagnosed Claimant with posttraumatic stress disorder and schizoaffective disorder, bipolar type. (Tr. at 1195.) At a follow-up appointment a month later, Claimant reported that she was "doing okay" and that her medication was working. (Tr. at 1186.) She claimed her last hallucination was two weeks prior to the appointment, but still had pessimistic thinking patterns. (Tr. at 1186.) Scholar observed Claimant was anxious, but interactive, neatly groomed, and calm. Scholar's diagnosis remained the same, but he revised his GAF assessment up to 58. (Tr. at 1187.)

In October 2009, Penny Stute, PMHNP ("Stute"), examined Claimant, who reported psychotic intrusions, auditory hallucinations, and paranoia. (Tr. at 1126-27.) Specifically, Claimant reported visual hallucinations of "dark, shadowy figures holding her down." (Tr. at 1126.) When the figures held her down, Claimant was unable to move, despite being awake. She also told Stute that recently, she needed only two hours of sleep per night, was more social than usual, and

FINDINGS &RECOMMENDATIONS          6                              [RMD]

experienced periods of grandiose behavior and high self-confidence. (Tr. at 1126.) Stute observed that Claimant had normal behavior, speech, and memory during the appointment, but noted that Claimant reported episodes of depression, moodiness and anger. (Tr. at 1128.) Stute assessed a GAF of 30, and diagnosed Claimant with (1) bipolar I disorder, mixed severe with psychotic features; (2) schizoaffective disorder, depressed type; (3) posttraumatic stress disorder; (4) opioid dependence in sustained full remission; and (5) alcohol abuse in sustained full remission in a controlled environment. (Tr. at 1128.)

At the request of the Commissioner, Claimant attended another consultive exam in August 2010, this time with licensed psychologist Dr. Emile Slatick ("Dr. Slatick"). (Tr. at 1200-1205.) Claimant described her mental health symptoms similarly to her previous exams, including periods of depression, hallucinations, suicidal ideation, and panic attacks alternating with manic periods of hypervigilance, distractibility, decreased need for sleep, grandiosity, psychomotor agitation, and irritability. (Tr. at 1202.) Claimant also described her social anxiety which makes her feel as if "people are watching her, talking negatively about her, and following her." (Tr. at 1203.) She briefly described her prior work experience, and told Dr. Slatick that she was attempting to secure disability benefits for several years "due to her physical and psychological difficulties." (Tr. at 1203.) Dr. Slatick noted that Plaintiff appeared genuine in her responses. He assigned a GAF of 36, and diagnosed Claimant with (1) Bipolar I Disorder with Psychotic features; (2) Panic Disorder without Agoraphobia; (3) pain disorder associated with a general medical condition; and (4) opioid dependence in sustained full remission. (Tr. at 1204.)    Dr. Slatick concluded that "it appears unlikely that [Claimant] has the capacity to secure and maintain employment at this time though sufficient improvement in functioning might make a consultation with personnel from the office of

vocational rehabilitation worthwhile at some point in the future." (Tr. at 1205.) Dr. Slatick also filled-out a Rating of Impairment Severity Form in which he notes Claimant has marked restrictions on activities of daily living, social functioning, and concentration, persistence, or pace. He also noted that even a minimal increase in mental demands or change in the environment would be predicted to cause Claimant to decompensate because of the severity of her mental health problems. (Tr. at 1206-07.)

The following month, Claimant saw Qualified Mental Health Specialist Barbara Joque ("Joque"). At the appointment, Claimant reported that her medication regimen adequately controlled her depression, but her anxiety continued to be problematic. (Tr. at 1209.) Her suicidal ideation remained consistent, but she did not experience hallucinations as frequently as months prior. (Tr. at 1209.) Joque noted Claimant was logical and had fair judgment, but had difficulty "recognizing potentially damaging social situations." (Tr. at 1209.) Joque adopted the diagnoses previously assessed by Stute, and assigned a GAF of 30. (Tr. at 1210.)

In October 2010, Claimant began seeing Dr. Raymond Baculi ("Dr. Baculi") for worsening neck and shoulder pain. (Tr. at 1240.) Dr. Baculi became Claimant's primary-care physician, and saw her several times in the following months for neck and lower back pain, cold and flu symptoms, and painful bilateral leg swelling. Early in 2011, Dr. Baculi endorsed his opinion as stated in a letter sent from Claimant's counsel. The letter, which Dr. Baculi endorsed and "[a]gree[d] with," explains that Claimant's degenerative disk disease has progressed and led to heightened stress and anxiety, which reciprocally causes Claimant additional back and neck pain. (Tr. at 1231). According to Dr. Baculi, "the combination of these conditions would cause Claimant to be unable to complete a 40-hour work week, even at a sedentary level, on a consistent basis." (Tr. at 1232.)

Around the time Claimant first began seeing Dr. Baculi, she was examined by orthopedic surgeon Dr. Jeffrey Knight ("Dr. Knight"). (Tr. at 1245.) Claimant detailed her treatment history for carpal tunnel, including pressure-release surgery on both hands. (Tr. at 1245.) Dr. Knight agreed with Claimant's previous diagnosis of carpal tunnel syndrome, and administered a steroid injection to relieve inflamation and pain in Claimant's wrists and hands. (Tr. at 1247.) He told Claimant to return in a few weeks for another injection if the first yielded results, but noted she may have to consider a second pressure-release surgery. (Tr. at 1247.) At a follow-up appointment several months later, Claimant reported that the steroid injection reduced her pain for a couple of months, but symptoms returned. (Tr. at 1300-01.) Dr. Knight suggested Claimant splint her wrists at night for several months. If she showed no improvement, Dr. Knight said they would consider a second pressure-release surgery. (Tr. at 1301.) The record does not indicate whether Dr. Knight ever performed the second surgery.

Between January and May 2011, Claimant saw psychiatrist Kay Dieter ("Dieter") on four occasions. (Tr. at 1292-96.) Claimant reported to Dieter that her bi-polar disorder was largely under control and her mental health was good. Her mood was "pretty good," she was able to concentrate, had fair insight and judgment, and she rarely experienced hallucinations. (Tr. at 1292.) Further, Claimant no longer experienced suicidal ideology, and had good hygiene and appearance. (Tr. at 1292-93.) At each appointment, Dieter assigned a GAF of 40-50. (Tr. at 1292-96.) Following Claimant's final appointment with Dieter in May 2011, Dieter wrote to Claimant's counsel. In her letter, she explained the following:

> [Claimant] has been stabilized with medications . . . to good effect. . . . She continues to experience anxiety, insomnia, confusion, hypersensitivity, some mild auditory hallucinations and paranoia; these result in isolating to avoid and manage symptoms. The symptoms are exacerbated by her current living situation (i.e., no income; no

insurance; no transportation).  However, it would be expected that they would also be exacerbated by having to maintain a work schedule, work with the public, and/or be in repeated contact with co-workers and supervisors. The symptoms do impair her ability to follow detailed instructions and complete complex tasks.  She would need special accommodations to be able to work on a full-time basis and having to do so could be expected to result in excessive absences when symptoms recur.

(Tr. at 1243.)  Dieter also opined in a separate letter to Claimant's counsel that Claimant would likely have "poor motivation and follow-through to seek and sustain gainful employment" due to her depression and anxiety.  (Tr. at 1362.)

Claimant also saw Dr. Gregory Lackides ("Dr. Lackides") for shortness of breath and ankle swelling, which had been continuous for the previous six months.  (Tr. at 1259.)  However, Dr. Lackides observed that Claimant's edema was "quite minimal" and responded well to low-dose medication.  (Tr. at 1259.)  Dr. Lackides concluded that Claimant's leg edema resulted from her other medications and suggested she discontinue taking her non-steroidal anti-inflammatory medications.  (Tr. at 1259.)  He also reported Claimant's disclosure that she was applying for Social Security due to her lower-back pain.  (Tr. at 1252.)  Dr. Lackides referred Claimant to Dr. Anna Macasa, M.D ("Macasa"), who observed Claimant was uncomfortable due to pain, and diagnosed Claimant with fibromiyalgia.  (Tr. at 1270.)

### Summary of the ALJ's Findings

The ALJ engaged in the five-step "sequential evaluation" process for evaluating SSI claims. 20 C.F.R. § 416.920.  The claimant bears the burden of proof at steps one through four, but the burden of production shifts to the Commissioner at step five to identify jobs existing in significant numbers in the national economy that the claimant can perform despite his or her residual functional capacity, age, education, and work experience. *Tackett v. Apfel,* 180 F.3d 1094, 1098-99 (9th Cir. 1999).  Each step is potentially dispositive. 20 C.F.R. § 416.920(a)(4).  The ALJ found as follows:

## I.  Steps One and Two

In step one, the ALJ determined that Claimant had not engaged in substantial gainful activity since November 4, 2008, the alleged onset date. (Sept. 9, 2011 Opinion of ALJ John J. Madden, Jr. ("ALJ Op.") at 2.)  At step two, the ALJ determined Claimant suffered from the following severe impairments: degenerative disc disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome, chronic hypotension, Sjogren's Syndrome, fibromyalgia, chronic obstructive pulmonary disease, obesity, major depressive disorder, anxiety disorder, and polysubstance abuse and dependence in remission based on the diagnosis of "an acceptable medical source." (ALJ Op. at 2.) The ALJ also found that Claimant suffered from hepatitis C and lower-extremity edema, but determined that they were non-severe. (ALJ Op. at 2.)

## II.  Step Three

At step three, the ALJ concluded Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of those listed impairments in the regulations. (ALJ Op. at 3.) The ALJ first determined that Claimant's affective and mood disorder satisfied the "paragraph A" criteria due to alleged anhedonia, appetite and sleep disturbances, psychomotor agitation, feelings of guilt and worthlessness, difficulty concentrating or thinking, suicidal ideation, hallucinations and paranoia, hyperactivity, and distractability.

Next, although the ALJ found Claimant had "mild restriction in activities of daily living, mild restriction in social functioning, and moderate difficulties with concentration, persistence, or pace," the ALJ determined that Claimant's mental impairments did not meet the "paragraph B" criteria. because she did not have at least two marked limitations or one marked limitation with repeated episodes of decompensation. (ALJ Op. at 5.) He noted that, while Claimant needed occasional

reminders to bathe and take medications, she could prepare simple meals, perform household chores, use public transportation, shop, handle money, attend church, and participate in drug recovery programs. Further, despite the testimony of Claimant's friend, who described Claimant as depressed, Claimant herself did not identify any significant functional limitations associated with her depression symptoms. Although Claimant alleged high anxiety and low social functioning, the ALJ relied on the Claimant's medical treatment records to conclude that Claimant "had the energy and motivation to attend to her activities of daily living[,] . . . had improved social functioning when taking medications[, and] . . . was able to attend and concentrate during counseling and other follow-up appointments." (ALJ Op. at 4.)

Finally, the ALJ determined that Claimant's limitations did not meet the criteria of "paragraph C" because she did not have repeated episodes of decompensation and was able to function independently.

III.  Residual Functional Capacity

The ALJ concluded that Claimant has the Residual Functional Capacity ("RFC") to perform light work. (ALJ Op. at 5.)  He held that Claimant "frequently can balance and kneel.  She occasionally can stoop, crouch, crawl, and climb ramps or stairs. . . . She can perform gross handling activities with her bilateral upper extremities frequently, but not constantly[,]" and can carry out simple, one to three-step tasks without special supervision.  (ALJ Op. at 5.)  However, the ALJ determined Claimant cannot climb ladders, ropes, or scaffolds; perform constant gross handling tasks with her hands; or perform detailed or complex tasks; and must avoid pulmonary irritants, workplace hazards, and concentrated exposure to vibration in her hands.

In making his RFC assessment, the ALJ made credibility determinations about claimant and

FINDINGS &RECOMMENDATIONS          12                              [RMD]

claimant's doctors. The ALJ determined Claimant's testimony about "the intensity, persistence, and limiting effects" of her alleged disabilities was not credible for several reasons. First, the ALJ discounted Claimant's credibility because she had a history of selling drugs, demonstrated "drug-seeking behavior" while seeking medical treatment, and had "no significant ties to the workforce." (ALJ Op. at 11.) Second, the ALJ found it suspicious that "claimant demonstrated an extreme focus on obtaining disability benefits, going so far as to close her case with Vocational Rehabilitation because she did not want her involvement with that agency to interfere with her obtaining disability." (ALJ Op. at 11.) As further evidence that claimant was fixated on obtaining benefits, the ALJ noted that claimant inconsistently described her symptoms, telling internal medicine doctors that she was disabled by lower-back pain and mental health practitioners that she was disabled due to her bi-polar disorder and depression. (ALJ Op. at 11.) The ALJ also concluded Claimant was exaggerating because the "sheer variety of diagnoses throughout the record . . . matched diagnostic criteria to a tee." In addition, the ALJ determined that the alleged severity of claimant's symptoms was inconsistent with her ability to use public transportation on a daily basis and her failure to follow through with suggested treatment. (ALJ Op. at 11-12.)

The ALJ also gave no weight to the opinion and report of Dr. Baculi, Claimant's treating physician. (ALJ Op. at 12.) According to the ALJ, the objective record, including x-rays and Dr. Cowan's comprehensive orthopedic examination, did not support Dr. Baculi's conclusion that the combination of Claimant's physical and psychological problems was disabling. Further, the ALJ was concerned by Dr. Baculi's January 2011 endorsement of a letter written by Claimant's counsel. The ALJ described it as "a letter summarizing an ex parte communication . . . the full contents of which have not been disclosed," but does not elaborate further on why the January 2011 letter was

improper.  (ALJ Op. at 12.)

The ALJ gave some weight to the opinion of Dr. Carrello, the state-agency examining psychologist. He accepted Dr. Carrello's conclusion that Claimant would be limited to simple tasks, and could have unlimited ability to interact in the workplace.  However, the ALJ rejected Dr. Carrello's ultimate conclusions regarding Claimant's limitations.  First, the ALJ reasoned that the record did not support Dr. Carrello's conclusion that Claimant would have difficulty maintaining attendance because Claimant was able to attend regular meetings with her probation officer and utilize public transportation. (ALJ Op. at 12-13.) Second, the ALJ determined Dr. Carrello relied too heavily on Claimant's "less than credible subjective reporting." (ALJ Op. at 12-13.) Third, the ALJ rejected Dr. Carrello's conclusion that Claimant's inability to repeat numbers forward and backward evidenced impaired concentration, explaining that Claimant's difficulty "manipulat[ing] numbers could simply be a math disorder given her history of special education in math . . . ." (ALJ Op. at 12.)  Ultimately, the ALJ concluded that Claimant's symptoms were not as severe as Dr. Carrello's functional limitation recommendation would suggest because she assessed a GAF of 60. (ALJ Op. at 13.)

The ALJ also gave "little weight" to Dr. Dieter's opinion because it was "entirely inconsistent" with the observations she reported during the examination. (ALJ Op. at 13.) Further, the ALJ determined that Dieter had limited contact with Claimant, relied too heavily on Claimant's self-report, and "failed to explain or flesh out her opinion."  (ALJ Op. at 13.)  Finally, the ALJ rejected Dieter's GAF assessment because it did not reflect the true severity of Claimant's symptoms and considered factors such as Claimant's financial situation, which the ALJ found irrelevant to the ultimate disability determination. (ALJ Op. at 13.)

Next, the ALJ determined that Dr. Slatick's opinion was entitled to no weight for the following reasons: (1) he only examined Claimant once; (2) he did not have access to Claimant's medical records; (3) he relied too heavily on Claimant's subjective report; and (4) his findings were inconsistent with objective evidence on the record. He discounted Dr. Slatick's opinion that Claimant would have difficulty maintaining employment and would likely decompensate if presented with work-related stressors because it was inconsistent with Claimant's ability to regularly attend appointments and utilize public transportation. The ALJ also questioned Dr. Slatick's assessment because "an individual as limited as Dr. Slatick described would be incapable of manipulating the system effectively enough to discontinue vocational rehabilitation services with the realization that they could be detrimental to her claim to disability." (ALJ Op. at 13.)

The ALJ gave weight to Dr. Alley, and "great weight" to the assessment of state agency non-examining psychological consultant Dr. Nicoloff, whom the ALJ does not mention anywhere else in his opinion. (ALJ Op. at 12.) According to the ALJ, Dr. Alley's RFC was entitled to significant weight because he accounted for each of Claimant's physical and mental disabilities when assessing her limitations. (ALJ Op. at 12.) Aside from describing Dr. Nicoloff's conclusions, the ALJ does not explain why Nicoloff was entitled to "great weight." (ALJ Op. at 12.)

IV. Step Four

At step four, the ALJ determined that the Claimant was unable to perform past-relevant work as a janitor, short-order cook, or fast-food worker because each position exceeded the exertional level of the RFC and had the potential to expose Claimant to workplace hazards. (ALJ Op. at 13.)

V. Step Five.

At step five, the ALJ agreed with the vocational expert that Claimant was capable of

performing other work that exists in substantial numbers in the national economy. He concluded that, given Claimant's age, education, work experience, an RFC, she could reasonably maintain employment as: (1) a bottling-line attendant; (2) a garment sorter; or (3) a food assembler. (ALJ Op. at 14.) On the basis of this conclusion, the ALJ determined Claimant was not disabled, and denied her application for disability. (ALJ Op. at 14.)

*Discussion*

Claimant objects to the ALJ's conclusion and urges the on three grounds: (1) the ALJ erred in discounting the credibility of Claimant's testimony; (2) the ALJ erred in failing to credit the opinions of her examining and treating physicians; and (3) the ALJ did not meet his burden at step five of proving Claimant is capable of performing other work in the national economy.

## I. Rejecting Claimant's Credibility

Claimant argues the ALJ erred in finding incredible her hearing testimony and statements to doctors describing "the intensity, persistence, and limiting effects" of her symptoms. The ALJ rejected Claimant's testimony for five reasons, described below. The ALJ must perform a two-step process to evaluate the credibility of subjective testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). Step one requires the plaintiff to produce objective medical evidence of an impairment "that could reasonably be expected to produce some kind of symptom." *Id.* If the claimant meets her burden on the first step, the ALJ moves on to step two, where the ALJ must accept the claimant's testimony regarding the severity of her symptoms unless there is affirmative evidence of malingering or the ALJ determines there are specific clear and convincing reasons for rejecting the claimant's credibility. *Id.* Overall, the ALJ must make "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Id.*

At step one, Claimant met her burden by submitting x-rays showing severe degenerative disc disease in her lower back, nerve conduction studies to support her diagnosis of carpal tunnel, and the reports of several mental-health specialists who agreed that Claimant exhibited signs of bi-polar disorder and schizoaffective disorder. The Commissioner does not contend that evidence exists on the record demonstrating Claimant malingered, so the ALJ must provide clear and convincing reasons for rejecting her testimony. *Id.*

At step-two, the ALJ rejected Claimant's credibility for the following reasons: (1) she has "no significant ties to the workforce because she spent most of her life as a heroin dealer;" (2) She used a cane when walking, which doctors opined was not medically necessary; (3) she displayed "obvious drug-seeking behaviors;" (4) she exhibited a fixation with obtaining disability benefits; and (5) the objective medical record did not support Claimant's testimony regarding the severity of her complaints. The ALJ first reasoned that Claimant's testimony was incredible because she had little work experience and spent most of her life dealing heroin. The ALJ fails to explain why a drug-related felony conviction reflects so poorly on Claimant that it justifies rejecting her credibility entirely. Further, the court could find no evidence that Claimant spent "most of her life" selling narcotics. Nevertheless, the court recognizes that Claimant indeed has a sporadic work history. The Ninth Circuit has held that a claimant's poor work history is a clear and convincing reason to find her incredible. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (upholding an ALJ's decision to find claimant incredible when she "had an 'extremely poor work history' and 'has shown little propensity to work in her lifetime,' which negatively affected her credibility regarding her inability to work.").

Substantial evidence on the record supports the ALJ's conclusion. Claimant was unemployed

for eleven years in the twenty-year period between 1992 and 2011, and in four of the nine years she was employed, Claimant earned less than four thousand dollars per year. The significant gap in Claimant's work history, coupled with the lack of evidence demonstrating a physical inability to work suggests that claimant was unwilling to maintain legal employment during that period.

Second, the ALJ rejected Claimant's credibility because she used a cane which doctors determined was not medically necessary. There is some caselaw on point regarding the relationship between a claimant's credibility and the use of medically unnecessary equipment. *See Robinson v. Soc. Sec. Admin.,* 12 Fed. Appx. 451, 454 (9th Cir. 2001) (mem.) (finding incredible a claimant's testimony that he needed to use a cane because claimant did not offer evidence the cane was medically necessary, and medical records indicated claimant was "fully ambulatory"). However, those cases usually involved a claimant's credibility rejected on a much narrower basis; only in regard to whether a claimant needs a cane or meets certain qualifications under the SSA because they occasionally use assistive devices when ambulating. *Id.* Here, the ALJ generally discounted Claimant's credibility simply because she used a medically unnecessary device to assist her walking. Regardless, as the Commissioner points out, using a medically-unnecessary device to walk, particularly to doctor appointments, suggests the claimant is exaggerating her symptoms. Evidence of exaggeration is a clear and convincing reason to reject a claimant's credibility. *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001). None of Claimant's treating or examining doctors told her to use a cane when walking, and Dr. Cowan even remarked in her report that it was "not medically necessary." There is substantial evidence to support the ALJ's finding that Claimant was exaggerating her symptoms, and thus stated a clear and convincing reason for rejecting her credibility.

Third, the ALJ found Claimant incredible because she exhibited "obvious drug-seeking behavior." Claimant argues that this is not a clear and convincing reason because it was reasonable for her to want medication to relieve her pain. Evidence of drug-seeking behavior is an appropriate credibility consideration in Social Security disability cases dealing with pain. *Thompson v. Comm'r of Soc. Sec.*, No. 3:13-CV-00437-MA, 2014 WL 848228, at *8 (D. Or. March, 4, 2014), *see also Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (upholding the ALJ's rejection of claimant's credibility in part because the claimant exaggerated "his complaints of physical pain in order to receive prescription pain medication to feed his Valium addiction"). "A claimant's drug-dependency *by itself*, however, is not a basis for an adverse credibility determination." *Thompson*, 2014 WL 84228, at *8. Instead, the court must find affirmative evidence of deceptive drug-seeking behavior. *Id.* Here, there substantial evidence suggesting deceptive drug-seeking behavior. In 2005, Claimant's primary care doctor terminated care because she abused her pain prescriptions and attempted to change the dosage on her prescription without her doctor's permission. (Tr. at 572-574.) Further, emergency room doctors noted Claimant was "a frequent utilizer of emergency care services secondary to [a] painful condition. She has frequent requests for pain medications and has a documented history of narcotic use and prescription misuse." (Tr. at 1151.) Claimant even admitted during one emergency-room visit that she occasionally traveled to Tijuana in order to procure morphine. (Tr. at 609.) The evidence affirmatively shows that the ALJ did not err by discounting Claimant's credibility due to her drug-seeking behavior.

The ALJ rejected Claimant's credibility fourth, because she demonstrated a fixation with obtaining disability benefits and fifth, because the medical evidence was inconsistent with her testimony. The court is not convinced that these are legitimate clear and convincing reasons to reject

Claimant's testimony. In support of his conclusion, the ALJ points to evidence on the record showing Claimant expressed a desire to obtain disability benefits, including one instance where she listed "obtaining SSI" as a career goal. However, a desire to obtain disability benefits is just as consistent with the behavior of one who is actually disabled as it is for an individual who wants to obtain benefits due to a lack of work ethic. Claimant's desire to obtain benefits is sufficiently probative of Claimant's poor work ethic to wholly discount her credibility. As for the ALJ's determination that the medical evidence was inconsistent with Claimant's testimony, the court already has determined that objective medical evidence supports Claimant's allegations regarding her symptoms.

Therefore, on this record, the objective medical evidence is not inconsistent with Claimant's testimony regarding the severity of her conditions. Nonetheless, the court should conclude that the ALJ did not err by rejecting Claimant's credibility be cause he provided three clear and convincing reasons for doing so. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (finding harmless an ALJ's rejection of a witness's testimony on erroneous grounds because the ALJ provided other legitimate reasons for rejecting the witness's testimony.)

II. Rejecting The Credibility of Treating and Examining Physicians

The Claimant next argues that the ALJ erred by failing to credit the opinions of Dr. Baculi, Dr. Cowan, Dr. Dieter, Dr. Carrello, and Dr. Slatick. The Commissioner claims that the ALJ properly assigned credibility determinations to each doctor, and gave adequate reasons for rejecting each opinion. The Commissioner argues that, to the extent the ALJ erred, it was harmless error that does not warrant reversal.

The ALJ must "thoroughly justify" the decision to reject the opinion of certain physicians.

> Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant.

*Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995). In addition, courts afford greater weight to the opinion of examining physicians than those of non-examining physicians. *Id.*

Where a treating doctor's opinion is uncontroverted on the record, the court generally gives it controlling weight. "To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). If, however, a treating or examining physician's opinion contradicts that of another doctor on the record, the ALJ may reject that physician's opinion on the basis of specific and legitimate reasons supported by substantial evidence. *Id.* An ALJ "need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Id.*

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d 830. As the Ninth Circuit held in *Gallant v. Heckler*, "the report of [a] non-treating, non-examinining physician, combined with the ALJ's own observance of [the] claimant's demeanor at the hearing," did not constitute substantial evidence sufficient to reject the opinion of a treating or examining physician. 753 F.2d 1450, 1456 (9th Cir. 1984).

A. Dr. Baculi

The ALJ gave no weight to treating physician Dr. Baculi's opinion that Claimant was disabled. The ALJ took issue with how Dr. Baculi presented his opinion, noting that Dr. Baculi

FINDINGS & RECOMMENDATIONS          21                    [RMD]

"'agreed' to a letter summarizing an ex parte communication between him and the claimant's representative, the full contents of which have not been disclosed." (ALJ Op. at 12.) The ALJ noted that, while Claimant's x-rays support Dr. Baculi's conclusions, they do not show a condition so severe as to be disabling. Further, the ALJ determined that Dr. Cowan's opinion was more credible than Dr. Baculi's because Dr. Cowan based her RFC on a "comprehensive orthopedic examination."

The Commissioner does not challenge Claimant's assertion that Dr. Baculi was her treating physician, but claims his opinion is contradicted on the record by the opinion of examining physician Dr. Cowan. The Claimant argues that Dr. Baculi's opinion is not contradicted, as Dr. Baculi based his opinion on Claimant's mental and physical health, whereas Dr. Cowan based her opinion only on Claimant's physical health. In *Beecher v. Heckler*, the Ninth Circuit was faced with similar facts. 756 F.2d 693, 694 (9th Cir. 1985). There, the claimant was evaluated by six doctors. *Id.* Five of the six doctors opined that claimant could return to work, albeit with varying degrees of functional limitation. *Id.* However, after an examination of the claimant's physical and mental health, the sixth doctor concluded that the plaintiff could not "compete in the labor market" because of the claimant's "post-traumatic neurosis with a mixture of hysterical and hypochondriacal ideas." *Id.* The court held that the sixth doctor's opinion was uncontradicted because, unlike the others, it took into account the combination of claimant's physical limitations and mental limitations. Thus, the medical opinions did not contradict because they "were not drawn from the same facts." *Id.* at 695, *quoting Dressel v. Califano*, 558 F.2d 504, 508 n.6 (8th Cir. 1977).

Dr. Baculi adopted the following statement drafted by claimant's counsel:

In September, x-rays were performed that showed degenerative disk disease. Those x-rays, when compared to previous x-rays, show that [claimant's] degenerative disk disease has progressed. The x-rays are objective evidence of a condition capable of causing [Claimant's] pain. [I] also indicated that [Claimant's] anxiety and depression

> symptoms cause her to experience her pain from her neck and back condition to a
> greater degree, and in [my] opinion, her chronic pain will cause her to experience a
> greater degree of symptoms from anxiety and depression. In [my] opinion, the
> combination of these conditions would cause [Claimant] to be unable to complete a
> 40-hour work week, even at a sedentary level, on a consistent basis.

(Tr. at 1231-32.) The only contradictory physician opinion cited by the ALJ and the Commissioner

is the opinion of Dr. Cowan. However, Dr. Cowan diagnosed Claimant as suffering from Carpal

Tunnel Syndrome, COPD, and lumbar back pain, and did not consider claimant's mental limitations

when making her disability determination. Here, like the doctors in *Beecher*, the opinions of Dr.

Baculi and Dr. Cowan "were not drawn from the same facts." Because Dr. Baculi's opinion is

uncontroverted on the record, the court should uphold the ALJ's decision to discount Dr. Baculi's

credibility only if the ALJ provided "clear and convincing reasons" for doing so.

The Commissioner argues that two clear and convincing reasons support the ALJ's

assessment of Dr. Baculi's credibility.[1] First, the ALJ determined that "[t]he x-rays provided as

support do not show an impairment so severe as to be disabling, only an impairment severe enough

to limit the claimant's work ability as recognized in the residual functional capacity herein." This

not a clear and convincing reason to discount Dr. Baculi's opinion. In the Ninth Circuit, courts have

long held that an ALJ may not substitute his own lay opinion for that of a physician. *Day v.*

*Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975). "[T]he Hearing Examiner, who [is] not qualified

as a medical expert, should [not go] outside the record to medical textbooks for the purpose of

making his own exploration and assessment as to claimant's physical condition." *Id.* The ALJ

---

[1]The Commissioner concedes that the ALJ erred by rejecting Dr. Baculi's credibility on
the basis that Dr. Baculi expressed his opinion in "an ex parte communication between him and
the claimant's representative, the full contents of which have not been disclosed." (Tr. at 25.)
However, the Commissioner contends this is harmless error, as there are other clear and
convincing reasons for finding Dr. Baculi incredible.

states, without citing evidence, that the x-rays do not support the level of disability claimed by Dr. Baculi.

The ALJ next claims that Dr. Baculi's opinion is entitled to no weight because his "records did not include a comprehensive orthopedic examination . . . ." (Tr. at 25.) This too is an insufficient justification for giving no weight to the opinion of the Claimant's treating physician. The Ninth Circuit held in *Allen v. Heckler* that, where a conflict exists between a treating physician and non-treating physician, and the non-treating physician's opinion is based on a thorough examination and independent clinical tests, an ALJ may treat the non-treating physician's opinion as substantial evidence for rejecting the opinion of the treating physician. 749 F.2d 577, 580 (9th Cir. 1984).

The *Allen* holding does not apply here. In *Allen*, the opinion of the treating physician and non-treating physician were both based solely on the claimant's physical limitations and were, thus, "drawn from the same facts." *Id., Beecher*, 756 F.2d at 695. Here, although Dr. Cowan's opinions were based on an a full orthopedic examination, her opinion was based only on Claimant's physical limitations. Dr. Baculi, on the other hand, based his opinion on the combination of Claimant's physical and mental limitations. Because Dr. Cowan's thorough clinical exam measured whether Claimant could perform substantial gainful activity based only on her physical limitations, her orthopedic examination – regardless of its thoroughness – does not adequately address or rebut each rationale for Dr. Baculi's conclusions. Thus, the ALJ has provided no clear and convincing reasons for rejecting Dr. Baculi's opinion.

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating physician, we credit that opinion as a matter of law. *Lester*, 81 F.3d at 834 (internal

quotation marks omitted).  Because the ALJ did not provide specific and legitimate, much less clear and convincing, reasons for rejecting the opinion of Claimant's treating physician, the court must credit Dr. Baculi's opinion as a matter of law, and conclude as a factual matter that Claimant's combination of mental and physical limitations render her "unable to complete a 40-hour work week, even at a sedentary level, on a consistent basis."

B.  Dr. Cowan

Dr. Cowan found that Plaintiff could perform only gross hand manipulation tasks such as handling, fingering, and feeling.  The ALJ credited this conclusion, but nonetheless concluded that Claimant could "perform gross handling activities with her bilateral upper extremities frequently, but not constantly.  The Commissioner concedes this was error, but argues it was harmless because the ALJ "impliedly rejected this portion of Dr. Cowan's opinion by adopting the opinion of state agency physician Richard Alley, M.D." (Def.'s Brief at 18.)

The court concludes that the ALJ erred by failing to properly discount the opinion of Dr. Cowan.  Even where an ALJ implicitly rejects an examining physician's opinion by accepting the contradictory opinion of another doctor, the ALJ must provide specific and legitimate reasons for rejecting the first doctor's opinion. *Nguyen v. Chater*, 100 F.3d 1462, 1465-66 (9th Cir 1996).  Here, the ALJ did not explicitly accept or reject the opinion of Dr. Cowan, but instead adopted an RFC which implicitly rejects Dr. Cowan's opinion regarding the frequency with which Claimant can perform gross handling tasks with her hands.  Thus, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Cowan's opinion.  However, after summarizing Dr. Cowan's findings, the ALJ mentioned Dr. Cowan only once in order to discount Dr. Baculi's credibility Therefore, the ALJ erred as a matter of law to provide specific and legitimate reasons for rejecting

Dr. Cowan's opinion that claimant only occasionally could perform gross manipulation tasks with her hands.

### C. Dr. Dieter

Claimant next argues that the ALJ failed to provide sufficient justification for Claimant's treating psychiatrist, Dr. Dieter. In a January 11, 2013, letter to Claimant's counsel, Dr. Dieter opined that Claimant's "symptoms do impair her ability to follow detailed instructions and complete complex tasks. She would need special accommodations to be able to work on a full-time basis and having to do so could be expected to result in excessive absences when symptoms recur." (Tr. at 1243.) The ALJ gave "little weight" to Dr. Dieter's opinion because: (1) her conclusions were "entirely inconsistent" with her clinical observations during Claimant's appointment and other evidence on the record; (2) Dr. Dieter had "very limited contact with the claimant at the time she offered her opinion;" (3) Dr. Dieter "failed to explain and flesh out her opinions . . . despite reasonable opportunity to do so;" and (4) Dr. Dieter relied too heavily on Claimant's self-reporting.

In arguing that the ALJ insufficiently justified his position, Claimant does not cite any law, but instead makes factual arguments. Claimant fails to carry her burden, and the court concludes the ALJ's decision is supported by substantial evidence. Each of the ALJ's reasons for discounting Dr. Dieter's credibility is supported by evidence on the record, and although some evidence weighs against the ALJ's interpretation, "[i]f the evidence admits of more than one rational interpretation, we must uphold the decision of the ALJ." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Here, the ALJ's interpretation of the evidence with respect to Dr. Dieter was reasonable, so the court does not find it error.

D.  Dr. Carrello

The ALJ gave "some weight" to the opinion of Dr. Carrello, and on the basis of Dr. Carrello's opinion, determined Claimant would be "incapable of dealing with detailed or complex tasks" or interacting appropriately in the workplace.  The ALJ rejected the remainder of Dr. Carrello's proposed limitations.  In partially rejecting Dr. Carrello's credibility, the ALJ determined her conclusions were inconsistent with her own observations and the record as a whole.  In particular, the ALJ held that (1) "the claimant's ability to attend meetings with her probation officer daily, including having to travel by public transportation, undermines the belief that the claimant cannot maintain her attendance when she must;" (2) "[h]er inability to manipulate numbers could simply be a math disorder;" and (3) Dr. Carrello's GAF assessment indicates the Claimant had much higher functioning that her ultimate conclusion suggests.  Further, the ALJ opined that Carello relied too heavily on Claimant's "less than credible subjective reporting."

The Claimant argues that none of the ALJ's justifications constitute specific and legitimate reasons for rejecting Dr. Carrello's opinion.  First, the Claimant argues that the ALJ's observation that Claimant was able to attend daily meetings with her probation officer does not contradict Dr. Carrello's opinion because attending work on a daily basis is much different than attending a one-hour meeting on a daily basis.  The court disagrees.  In evaluating the credibility of medical evidence, the ALJ is required to take into account several factors, including whether the evidence as a whole support's a physician's conclusion. 20 C.F.R. § 404.1527(c)(3).  Here, the ALJ made the determination that, due to contradictory substantial evidence on the record, Dr. Carrello's opinion regarding Claimant's ability to meet attendance requirements was not fully supportable given other evidence on the record.  This determination is supported by the record.

Similarly, the ALJ did not err by rejecting Dr. Carrello's opinion because her GAF assessment was inconsistent with her ultimate opinion on Claimant's disability. One factor an ALJ may consider when assessing the credibility of medical evidence is consistency. 20 C.F.R. § 404.1527(c)(4). Here, Dr. Carrello concluded Claimant would be unable to maintain employment, while simultaneously assigning a GAF of 60. A GAF between 51 and 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupation, or school functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical manual of Mental Disorders*, 34 (4th ed. 2000, text revision). Although a GAF score is not dispositive to the court's ultimate disability determination, it is nonetheless a useful "snapshot" of a claimant's functioning. *Wentzek v. Colvin*, No. 3:12-cv-01687-SI, 2013 WL 4742993, at *8 (D. Or. Sept. 3, 2013). Here, it was not error to find inconsistency between Dr. Carrello's initial conclusion that Claimant had "moderate difficulty" with occupational functioning and her ultimate conclusion that Claimant is wholly unable to work due to a permanent disability.

Finally, the ALJ did not err by rejecting Dr. Carrello's opinion because she relied too heavily on Claimant's incredible self-report. This was not error. "An opinion of disability premised to a large extent upon the claimant's own accounts of [her] symptoms and limitations may be disregarded, once those complaints have themselves been properly discounted." *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). As the court already discussed, the ALJ did not err in rejecting the Claimant's credibility. Therefore, it was not error to reject medical evidence, like Dr. Carello's opinion, which is based largely on the unreliable self-report of the claimant.

The ALJ's second justification for rejecting Dr. Carrello's opinion, however, was insufficient. The ALJ's wholly unsupported conclusion that Claimant's difficulty dealing with

numbers was a math disorder is yet another example of the ALJ substituting his own lay opinion for that of a medical expert. As discussed *supra*, this is error, but because the ALJ provided three specific and legitimate reasons for rejecting Dr. Carrello's opinion, this error was harmless. *Carmickle*, 533 F.3d at 1162. As a result, the court should uphold the ALJ's credibility determination.

E. Dr. Slatick

Claimant also argues that the ALJ erred by failing to adequately discount the credibility of Dr. Slatick with specific and legitimate justifications supported by substantial evidence. However, in making her argument, Claimant cites no legal authority. Instead, she relies on factual arguments and attempts to show that the ALJ's credibility determination is contradicted by the record. Given the significant deference afforded to an ALJ's opinion, the court cannot find, based on Claimant's factual arguments, that the ALJ's justifications for rejecting Dr. Slatick's credibility are supported by substantial evidence. Even if Claimant successfully points to evidence which contradicts the ALJ, she fails to demonstrate that the evidence cited by the ALJ falls below the substantial evidence threshold. Therefore, the court does not find error in the ALJ's decision to reject Dr. Slatick's credibility.

III.  Proving Plaintiff Retains the Ability to Perform Other Work in the National Economy

Claimant next contends that the ALJ committed reversible error by failing to include "moderate difficulties in concentration, persistence, or pace" in the hypothetical posed to the VE despite identifying it as a limitation at step three. The Commissioner claims this was not error, and distinguishes between the ALJ's "Paragraph B" assessment at steps two and three, and the RFC assessment at steps four and five. In support of its position, the Commissioner cites a Social Security

Report defining and explaining the RFC process. That report, entitled "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims" provides:

> The psychiatric review technique described in 20 C.F.R. 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments and summarized on the PRTF.

SSR 96-8P, *available at* 1996 WL 374184, at *4 (July 2, 1996).

Despite the interpretation cited by the Commissioner, the Ninth Circuit has found failure to include "difficulties with concentration, persistence, or pace" in the VE hypothetical to be reversible error when the ALJ found such a limitation at step three. For example, in *Lubin v. Comm'r of Soc. Sec.*, the Ninth Circuit concluded:

> Although the ALJ found that Lubin suffered moderate difficulties in maintaining concentration, persistence, or pace, the ALJ erred by not including this limitation in the residual functional capacity determination or in the hypothetical question to the vocational expert. The ALJ must include all restrictions in the residual functional capacity determination and the hypothetical question posed to the vocational expert, including moderate limitations in concentration, persistence, or pace.

507 Fed. Appx. 709, 712 (9th Cir. 2013) (mem.). In *Lubin*, the ALJ accepted medical evidence that the claimant suffered difficulties with concentration persistence or pace, but failed to include this limitation in the RFC or the VE hypothetical. *Id.* The court determined it was error, and reversed for additional administrative proceedings. *Id.* Clearly, courts around the country have determined that, despite the aforementioned Social Security Ruling, which is arguably entitled to deference

under *Chevron U.S.A. v. Natural Res. Def. Counsel, Inc.,* 467 U.S. 837 (1984), failure to include

limitations related to concentration, persistence, and pace in hypothetical questions posed to the VE

is reversible error in this jurisdiction. *Lubin* is a memorandum opinion which, according to the

court, holds no precedential value. However, given that the court ruled similarly in *Brink v. Comm'r*

*Soc. Sec. Admin.,* 343 Fed. Appx. 211, 212-13 (9th Cir. 2009) (mem.), it is likely a good indicator

of how the court would rule in a published opinion which has the force of law in this district. In

addition, the reasoning employed in the *Lubin* and *Brinks* decisions is reinforced by a line of cases

spanning across several circuits. *See Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir. 2004) (finding

a one-to-two-step task limitation did not adequately account for impairment in concentration,

persistence, or pace); *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir. 2009) (same); *Winschel v.*

*Comm'r of Soc. Sec.,* 631 F.3d 1176, 1181 (11th Cir. 2011) (same).

      Similar to *Lubin* and *Brink,* the ALJ in this case found during step three that Claimant had

"moderate difficulties with concentration, persistence, or pace," but included no such limitation in

claimant's RFC or hypothetical VE questions. Because the hypothetical posed to the VE did not

contain all of Claimant's limitations, the VE's testimony has no evidentiary value. *Megallanes v.*

*Bowen,* 881 F.2d 747, 756 (9th Cir. 1989). Therefore, the court must follow established Ninth

Circuit precedent and conclude that the ALJ committed reversible error by failing to include all of

Claimant's limitations in the hypothetical questions he posed to the VE.

IV.  Remand for New Hearing or an Award of Benefits

      The ALJ erred by (1) failing to provide clear and convincing reasons for rejecting Dr.

Baculi's opinion; (2) providing insufficient justification for rejecting portions of Dr. Cowan's

opinion favorable to Claimant; and (3) failing to include all of Claimant's exertional and non-

exertional limitations in the hypothetical questions posed to the VE. All three of these errors are reversible. The court, then, must determine whether to remand for additional administrative proceedings or for an award of benefits.

The court has "discretion to remand a case either for additional evidence and findings or to award benefits. *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Where the record is fully developed and "further administrative proceedings would serve no useful purpose," the court will generally direct an award for benefits. *Id.* The Ninth Circuit has held that additional administrative proceedings are futile where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting [certain] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.*

Here, the ALJ gave legally insufficient reasons for rejecting the opinions of Dr. Baculi and Dr. Cowan. As the court discussed *supra*, the ALJ's failure to adequately justify rejecting Dr. Baculi's opinion requires the court to credit that opinion as a matter of law. *Lester*, 81 F.3d at 834. When Dr. Baculi's opinion is given full credibility, the court is required to find that Claimant's combination of mental and physical limitations render her disabled. Therefore, the court should reverse the ALJ's decision and remand this case back to the ALJ with directions to award Claimant benefits.

*Conclusion*

For the reasons stated herein, the court should REVERSE and REMAND this case (Dkt. No. 1) with directions to award Claimant benefits.

*Scheduling Order*

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 27, 2014. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 13th day of August, 2014.

JOHN V. ACOSTA
United States Magistrate Judge